NOT DESIGNATED FOR PUBLICATION

Nos. 121,482
121,483
121,484

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.W., J.W., and J.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Douglas District Court; BETHANY J. ROBERTS, judge pro tem. Opinion filed January 31, 2020. Affirmed.

*Jennifer K. Wika*, of Jennifer K. Wika, Attorney at Law, of Rio Rancho, New Mexico, for appellant natural mother.

*Maria C. Davies*, legal intern, *Kate Duncan Butler*, assistant district attorney, and *Charles E. Branson*, district attorney, for appellee.

Before SCHROEDER, P.J., MALONE and STANDRIDGE, JJ.

PER CURIAM: In this consolidated appeal, V.W. (Mother) appeals the district court's decision to terminate her parental rights over her two daughters, A.W. and Je.W., and her son, Ja.W. (collectively, the children). Mother argues that (1) the district court erred in finding Mother unfit; (2) the district court abused its discretion in finding it was in the children's best interests to terminate Mother's parental rights; and (3) the district court's finding of fact in paragraph 32 of the termination order was unsupported by the record. After carefully reviewing the record, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

Mother was 17 or 18 years old when she met G.W. (Father). In 2004, A.W. was born while Mother was still in high school. While no formal diagnosis appears in the record, A.W. was described as "slower mentally," "lower functioning," or having "a mild intellectual disability." Mother stated A.W. has a learning disability and A.W. described herself as "slow, like [Mother]."

In 2007, Je.W. was born and Mother and Father got married. By the time she was two years old, Je.W. had two heart surgeries to fix two holes in her heart. Je.W. must take daily medication for her heart condition. Je.W. is also deaf in her left ear and requires a hearing aid. In 2013, Ja.W. was born.

In 2014, when she was seven years old, Je.W. was hospitalized after she made suicidal threats and threatened to kill Mother. Je.W. was diagnosed with a mood disorder and anxiety disorder. Although Je.W. continued to make suicidal statements, Mother did not continue Je.W.'s therapy past 2015.

In 2014, Jenifer Herman, a child protection specialist with Kansas Department for Children and Families (DCF), investigated Father for alleged physical abuse of Je.W., but the allegation was unsubstantiated. In 2015, Herman investigated Mother and Father for alleged lack of supervision of Ja.W., but the allegation was unsubstantiated. In 2016, she investigated Mother and Father for alleged physical abuse and lack of supervision of the children, but the allegation was unsubstantiated.

On April 13, 2017, Father was arrested on five counts of rape against two girls close to his daughters' ages. A.W. and Je.W. were placed in police protective custody because one of Father's victims told detectives that Father also sexually abused A.W. and Je.W. Douglas County Sheriff's Detective Rita Fulton-Mays interviewed Mother that day.

Fulton-Mays stated Mother did not seem concerned about the children because she did not ask how the children were or even where they were. Instead, Mother was more concerned with Father and she informed Fulton-Mays that the child victims were liars. Mother said she would bond Father out of jail if she could find the money. Because of this, the police felt it was in the children's best interests to be removed from the home, and they placed Ja.W. in protective custody as well. The case was assigned to KVC Health Systems, Inc. (KVC) for temporary placement and foster care.

On April 18, 2017, the State filed a petition asking the district court to find the children to be children in need of care (CINC) and to find that an emergency existed requiring removal of the children from their home. On April 25, 2017, the district court awarded temporary custody to the State and set the matter for formal hearing. In granting temporary custody, the district court adopted the recommendations of DCF and entered them as court orders. The recommendations included, among other requirements, that all visitation and conversations between Mother and the children be supervised and that Mother not discuss Father's criminal case with the children. The district court also prohibited Father from having contact with the children, directly or indirectly.

Chloe Ireland-Fish, the family's KVC caseworker from April 2017 through December 2017, went over an initial medical packet for the children with Mother. When completing this packet, Mother reported Je.W.'s heart condition, but she did not mention that Je.W. required medication for it or that Je.W. had a hearing problem. Because Mother did not report her hearing problem, Je.W. was without her hearing aids for two to four weeks. Je.W. was also without her heart medication at first but received it within a week because Mother contacted Ireland-Fish when the refill became due.

Ireland-Fish started the children in therapy and supervised weekly visits between Mother and the children. Visits started at KVC's office but were then moved to Mother's home because KVC prefers to conduct visits in the home environment. When he was told

the visits were being moved to Mother's home, Ja.W. began having encopresis—soiling oneself—would get "catatonic" and would throw up. After a few visits in Mother's home, the visits were moved back to the KVC office because of Ja.W.'s anxiety.

During visits, Mother told Ireland-Fish more than once that Father was innocent. Mother talked to the children about Father during 60 to 70 percent of the visits. During one visit, Mother used Facebook to show the children one of Father's alleged victims and told A.W. that the alleged victim was a "lying little bitch." Mother also showed A.W. a newspaper article about Father's criminal case on her phone.

Ireland-Fish saw Mother and the children pass a few letters from either the girls to their Father or from Father to the children, which was a violation of the court. Mother also used her phone during a visit to talk to Father. Ireland-Fish eventually banned phones because she was concerned with how much time Mother was spending on her phone versus the time she spent with the children.

Ireland-Fish tried to work with Mother on a budget multiple times, but Mother did not believe she needed help with budgeting. Eventually, Mother completed a budget, which showed she did not have enough income to cover her expenses. To help, KVC gave Mother a $30 gas card each month and twice helped her pay her utility bills, one bill was $78.34 and the other was $83.95.

KVC also tried to help when Mother had trouble with her car. Ireland-Fish drove Mother home from some visits, which is not a typical duty of a KVC caseworker, because she did not want Mother to miss visits simply because she could not get a ride home. KVC also requested that Mother take her car to a garage so KVC could try to get it fixed, but Mother did not do so.

On June 1, 2017, Dr. Jean Dirks completed a psychological and parenting evaluation of Mother. Dirks diagnosed Mother with a mild intellectual disability and determined Mother has an overall mental age of only eight years and three months, the cognitive function of a six- to nine-year-old, the memory of a seven-year-old, and the knowledge of an eight-year-old. Mother's disability originated in childhood. Mother's disability means she does not remember what people tell her and she is unable to increase her knowledge. Dirks reported that Mother's cognitive limitations make it hard for her to understand the children's needs or how to supervise and care for them.

Dirks also found Mother has poor judgment and limited daily living skills. For instance, Mother reported that she makes $480 twice a month, but her monthly expenses include $665 for rent on a five-bedroom house, $300 in utilities, $367 for her phone bill, which included iPads for the girls, and unknown amounts for food and the couple's bankruptcy payments. Dirks stated that Mother did not realize she should ask her two roommates for rent.

Based on her evaluation, Dirks concluded that Mother "is well-intentioned, but it would be extremely difficult for [Mother] to safely take care of her children" and Dirks believed that "[Mother's] parenting prognosis is bleak." She recommended that (1) KVC work on budgeting with Mother; (2) Mother take one-on-one parenting training; (3) A.W. and Je.W. not be left alone for more than a few minutes with Ja.W.; (4) KVC supervise visits, Mother not talk to the children about Father, and no messages from Father be given to the children; (5) the children should never share a home with Father, Mother's sister, or Mother's sister's boyfriend; and (6) A.W.'s therapist should provide basic sex education. KVC recommended that Mother follow all of Dirks' recommendations and that she participate in a parenting education class. On June 8, 2017, the district court adjudged the children to be CINCs. The district court adopted the recommendations of KVC and Dirks as court orders.

Joseph Berry, an outpatient therapist and certified parent trainer, worked with Mother on completing Parent Management Training—Oregon model (PMTO), which included topics on encouragement, limit-setting, monitoring and supervision, problem solving, and positive involvement. Mother participated in one hour of parenting training and then the second hour consisted of family therapy where she would try to implement the skills learned. These sessions were in addition to the weekly visits. Mother could implement the skills learned, with Berry's help through whisper coaching, in the family therapy session immediately following the parent session. Mother completed PMTO in January 2018, and Berry recommended that Mother start individual therapy at KU.

In January 2018, Meghan Chilton took over as the family's KVC caseworker. Mother never progressed past supervised visits while Chilton was on the case. During visits, Mother gave more attention to the girls and let the girls care for Ja.W. Mother never intervened to take over caring for Ja.W. Mother also texted on her phone during some visits instead of properly supervising the children.

In March 2018, Father went to prison, but Mother continued to talk with him daily, which Mother paid for by putting $30 to $40 per week on Father's phone account. Mother also gave Father either $200 or $300 for the commissary. At some point after he went to prison, Mother divorced Father, but she continued to talk to him and place money on his account until November 2018.

In June 2018, Jordan Couey took over as the family's case manager and worked with them through the termination hearing in April 2019. Visits remained supervised and did not progress to community-based visits because Mother still failed to supervise all three children. For instance, sometimes during visits at KVC, Ja.W. would run out of the visit room and Mother would just stay in the room with the girls while he ran around outside or elsewhere in the office.

During visits, Mother mainly interacted with A.W. and left Je.W. and Ja.W. to interact together. Mother would briefly ask the children how they are doing in school, but once the children stated they were doing good, she would change topics. Instead, Mother talked to the girls about their friends, told the girls about her boyfriend, and talked to A.W. about A.W.'s boyfriend. At one visit, Mother gave A.W. a ring, which Mother got from A.W.'s boyfriend, and told A.W. it was a promise ring. A.W. was only 15 and did not see or live near her boyfriend.

Couey observed that Mother "very rarely" implemented strategies from her parenting training. For instance, most of the time Mother would ask Ja.W. to clean up at the end of a visit, but when he failed to do so, Mother just cleaned it up for him. During one visit, Je.W. climbed on a dumpster and was upset, and when Mother could not get her down, Mother simply walked away. Mother filled out a budget in the summer of 2018, which reflected she still did not have enough income to cover her expenses. The budget reflected only Mother's expenses and did not include any of the children's expenses.

On October 19, 2018, Berry saw Mother and the children when he was leaving the office. Mother and Ja.W. were riding bikes in the parking lot when Mother accidentally clipped the back of Ja.W.'s bike. Mother told Ja.W. that she was frustrated he cut in front of her. Within a few seconds of Mother's comment, Ja.W. got off his bike and vomited. Mother immediately left the area and Berry went to care for Ja.W. until Mother returned.

At another visit, Ja.W. got sick and threw up in a trash can. Mother immediately left the room and Je.W. went to check on her. Je.W. then returned, asked Ja.W. if he was okay, got paper towels, and started cleaning the trash can. Mother informed Couey that she would get sick if she cleaned it up, so Mother stayed outside the visit room until Je.W. finished cleaning.

During Couey's time as case manager, Mother had unsupervised contact with the children, despite the court's order. Mother talked to A.W. on Facebook at least once or twice a week. A.W.'s foster mother saw Mother's post that said she had a boyfriend who was in jail. When A.W. commented on that post, Mother told A.W. not to tell anybody about her boyfriend because they did not need to know. A.W.'s foster mother also saw a post in which Mother stated she was upset that A.W. broke up with her boyfriend.

Couey was also told that Mother was communicating with the children by other means. A.W. said Mother was talking to them through their friends. A.W. and Je.W.'s foster mother discovered the girls used their friends' phones and the bus driver's phone to talk with Mother. Je.W. told her therapist that she was still getting information about Father because her aunt talked to Father, then her aunt told Mother, and Mother told her.

On July 25, 2018, the district court entered a journal entry finding that reintegration was no longer a viable goal. On August 27, 2018, the State filed a motion for termination of parental rights.

In September 2018, Mother moved into her mother's three-bedroom home that she shared with Mother's stepfather and Mother's uncle. Also, in September, Je.W. was briefly hospitalized because she ran away after she tried to push her foster mother down the stairs and threatened to kill her. On Thanksgiving, Je.W. cut herself and was screaming, kicking, and throwing things. Her foster mother went through her room and removed everything sharp, including anything that could be broken like bobby pins or hangers. In December 2018, Je.W. was placed in a residential treatment facility for aggression and suicidal ideations, and she remained there through the termination hearing.

Sometime before the termination hearing, Mother began dating Quentin Sowers. Mother knew Sowers was on probation and had some drug problems when she met him.

8

Sowers was arrested while driving Mother's car and charged with 10 counts of burglary, 10 counts of criminal damage, and 10 counts of theft. Mother went to see Sowers in jail at least three times and talked to him on the phone while he was in jail. Mother last talked to Sowers on April 22, 2019, the day before the termination hearing began.

On April 19, 2019, Mother quit her job, but she had a new job lined up to start on April 30, 2019, that would pay $11.50 per hour. At her new job, she would work the second shift from 4:30 p.m. to 2 a.m.

*The termination hearing*

The district court held a termination hearing on April 23-26, 2019. Berry testified as Mother's parent trainer. Berry testified that Mother had not implemented her PMTO skills. Berry believed Mother had more of a friend-type bond with A.W. and Je.W. Berry testified that Je.W. showed signs of parentification because she would care for Ja.W. and Ja.W. would go to Je.W. instead of Mother for things. Berry tried to help Mother take the parent role for Ja.W. at least five to six times over the course of PMTO.

Ireland-Fish testified to her supervision of visits. She did not think she could have done anything else to facilitate reintegration. Ireland-Fish testified that generally visits do not remain at one-hour supervised visits in cases lasting over eight months. When she left the case, Ireland-Fish would not have been comfortable returning the children to Mother because Mother had not progressed past supervised visits and she was worried about possible contact with Father. Ireland-Fish saw Mother trying to implement her parenting training skills, but Mother could not successfully implement the strategies long term. Ireland-Fish testified that Mother seemed to have a friend-type relationship with A.W. and Je.W. and the girls parented Ja.W. more than Mother did.

9

Chilton also testified to her supervision of the case. She saw little improvement in the way Mother parented the children during the six months she supervised visits. Chilton also stated that two weeks before the hearing, she filled in for Couey to supervise a visit and "nothing's changed" between that visit and the visits she supervised in early 2018. At this latest visit, Chilton still saw Je.W. caring for Ja.W. and saw Mother laugh at Ja.W., who was hitting Mother and throwing toys at Chilton, rather than give him consequences. Chilton testified that this case is not close to reintegration because there is still secrecy, lies, a lack of supervision, and a concern for the children's safety since Mother normalizes inappropriate behavior. When asked for an example of Mother normalizing inappropriate behavior, Chilton pointed to Mother's continued relationship with Father and her refusal to admit what Father did. When asked whether any of the children made statements about sexual abuse, Chilton testified that Ja.W. once said his Father "used to push him down and do things that would hurt his bottom and his penis."

Couey testified to her supervision of the case. She stated that she did not believe Mother was ready for reintegration because there were still concerns about secrecy and Mother's ability to meet the children's needs. As for secrecy, Couey pointed toward Mother's contact with A.W. on Facebook. Couey said Mother's contact with Father was concerning because Mother reported she could not provide food for the children at visits but could put money on Father's phone account.

Couey stated all three children have mental health needs which would require at least three appointments a week for therapy, and Je.W. has extensive needs because of her suicidal and homicidal ideations and her medical needs. Couey expressed concern with how Mother would manage these needs while working the second shift. She also had concerns about how long the children have been out of Mother's home. KVC usually likes permanency within a year but, here, it had been two years and they "aren't even close to reintegration." Couey believed that adoption was in the children's best interests because current placements had been meeting their needs.

10

Rachel Asbury, A.W.'s therapist for the past two years, testified that A.W. has post-traumatic stress disorder (PTSD) and a major depressive disorder with psychotic features. A.W. also has a fear of failure, low self-worth, and delayed social development. Asbury testified that A.W. shows signs of parentification, meaning she has been caring for herself and her family. When asked for an example, Asbury pointed to an instance in which A.W. learned that Mother got a black eye from slipping on ice and A.W. stated she needed to be there to care for Mother or Mother would not get enough care.

According to Asbury, A.W. does not talk about her life preremoval because she is afraid of saying something that will keep her from being returned and because she is trying to avoid traumatic triggers. A.W. had disclosed no sexual abuse to Asbury and only once mentioned that Mother hit her when she was talking back. Asbury testified that A.W.'s current placement is doing "an excellent job" helping A.W.

Shelley Coughlin, Je.W.'s therapist at the residential treatment facility, testified that Je.W. tends to dysregulate—she becomes angry, aggressive, disruptive, and noncompliant. When Je.W. first presented, she had "blocked memory because there was a significant chunk of her life that she didn't remember [or] couldn't talk about." Coughlin believed that some of Je.W.'s responses were coached because her answer for everything was "it was good" or "nothing happened" and when asked more details about why it was good she gave few or vague answers.

Coughlin testified that Je.W. does not act like a kid and gravitates toward caring for her peers and younger children. Je.W. said being a caregiver is just "'the role that [she is] used to'" because she cared for Ja.W. and A.W. cared for her. Coughlin concluded that Je.W. was parentified. Je.W. told Coughlin that she does not want Mother's rights to be terminated because she is worried about how it will affect her relationship with her brother. Coughlin testified that there is not a connection between Je.W. and Mother. For

11

her continuing mental health, Je.W. needs structure and stability, which she was not receiving from Mother, along with consistent individual and family therapy.

Berry also testified as Ja.W.'s individual therapist. Ja.W. was originally referred because he was exposing himself to other children and touching other children's genitals. Berry diagnosed Ja.W. with an adjustment disorder unspecified, which is "the development of emotional behavioral symptoms in response to an identifiable stressor." Berry worked with Ja.W. on decreasing anxiety related to past traumas, increasing feelings of safety and trust, increasing assertiveness, and understanding appropriate boundaries for himself and others.

During play therapy, Ja.W. made statements about Father hurting him, his sisters, and Mother. For instance, Ja.W. said that his sisters were hiding in his room when Father broke down the door, and Mother was hiding in her bedroom while this occurred. Ja.W. also told Berry that he was hiding from monsters in his home that looked like "daddy." Ja.W. did not disclose sexual abuse to Berry. But Ja.W.'s foster mother told Berry that once Ja.W. came home from a visit and his butt was red, so they asked him about it and he stated: "'maybe it happened when my dad struck [*sic*] a great big police gun inside my bottom and shot me . . . . It's okay, he can't hurt me now, because I'm at your house.'" Berry stated that in play therapy, the child dictates what conversations they have, so he had not asked Ja.W. about this statement. Berry testified that he does not see reintegration with Mother being viable soon. Ja.W. gets almost catatonic when asked about visits, which could point to feelings of animosity.

Dirks testified to her evaluation of Mother. She stated Mother's judgment is poor and gave the example that Mother believes sexual abuse could not have occurred in her home at night because the noise would have woken her up. Dirks testified that because Mother's memory and knowledge is at the level of an eight-year-old, she would not retain the information learned in parenting training. For instance, Mother immediately ignored

12

Dirks' instructions not to leave Ja.W. behind when she left the room and not to tell the children they will come home soon. Dirks testified that attendance alone at parenting training is not enough; Mother would have to show she processed the information and was able to implement it.

Dirks opined that since the children each had different challenges and Mother had the mental age of an eight-year-old, she thought it was impossible for Mother to "bridge the gap" between the needs of the children and her abilities. Dirks also thought it would be hard for Mother to recognize and handle a crisis and her friendship-like relationship with A.W. and Je.W. was inadequate to keep them safe. Dirks believed Mother is "at risk for hooking up with a smooth-talking, but bad-behaving man." Dirks explained that if someone had a criminal past but told Mother it was all lies, she would likely believe them and not be alert to the possible dangers presented by the relationship.

Herman testified to her previous investigations and stated that since the children were removed, she conducted four additional investigations. In July 2017, she investigated a sexual abuse allegation with Ja.W. as the victim and the perpetrator being unknown, but the investigation was unsubstantiated because of Ja.W.'s delayed verbal skills. In August 2017, Herman investigated Mother's sister's boyfriend and Mother for alleged sexual abuse and lack of supervision of Je.W., but it was also unsubstantiated. Herman investigated A.W. and Je.W. for alleged sexual abuse of Ja.W., but the allegation was unsubstantiated. Herman investigated Mother for allegations of physical abuse of Je.W. and A.W., reported by Ja.W., but it was again unsubstantiated. Herman was concerned that the children were told not to speak or disclose certain things because during interviews the children said "[m]y mom told me this" and then gave a verbatim answer every single time. DCF did not offer the family any services.

Herman stated that none of the children disclosed any sexual abuse, but she believed that Father sexually groomed A.W. A.W. told Herman that Father would wake

13

her up at 5 a.m. and make her run his bath water, rub lotion on him, and give him massages before he went to work. She would also make his breakfast and lay out his pills and clothes. Herman testified that A.W. did not have an accurate understanding of the difference between sex and rape and could only describe sex in "infantile" terms.

Fulton-Mays testified to her interview with Mother the day Father was arrested. The State also called Douglas County Sheriff's Detective Chris Thomas, the lead detective on Father's case. The gist of Thomas' testimony was that he believed Mother helped remove evidence at Father's direction. Thomas believed this based on information he learned from the jail calls between Mother and Father, which the State admitted into evidence. The State did not elaborate on what the tapes discussed, and the tapes do not appear in the record.

Mother testified on her own behalf. She admitted that she knew there was a court order prohibiting Father from having contact with the children and that she violated it "a couple of times." Mother stated she talked to Father once a day and she would pass on messages from Father to the children during visits. At one visit, she and the children went into the bathroom and she left her phone on speaker phone while on a call with Father. Mother also let the children say "hi" to Father on the phone a couple of times. Mother testified that the note the caseworkers referred to was from A.W. and Je.W. to their Father saying that they loved him and missed him. Mother acknowledged that she called the criminal victims "bitch[es]" and "liar[s]" in front of the girls "a few times" but said, "so did [the girls]."

Mother said she viewed getting a divorce as a court order because the court told her to choose between her husband or the children. Mother admitted that she told Father that they would get a divorce to get the children back, and she agreed that while she got a divorce on paper, her actions showed that she was still in a relationship with Father. Mother said that in March 2018 she started to believe Father committed the crimes

14

because she read the police report. But Mother continued to talk to Father until November 2018, and only decided to stop talking with him because she was tired of arguing and he accused her of dating other people.

Even at the termination hearing, Mother stated that there was no chance Father sexually abused A.W. and Je.W. "[b]ecause some of the time, or most of the time I was around 'em. Besides being at work. And he would never hurt his own kids." Mother also stated that she thought A.W. rubbing lotion on Father was appropriate because "it's just like [A.W.] putting lotion on me if I can't reach my back." Mother testified that if the children had been "touched down and below" they would be walking like they were sore and would cry.

Mother admitted to talking to A.W. on Facebook but denied that it occurred daily. When asked if she thought it was appropriate for her to contact A.W. on Facebook, Mother responded: "I'm not going to ignore my daughter's post. When I see her post something on Facebook I am going to answer her because I don't want her thinking I am going to ignore her." Mother most recently talked to A.W. on Facebook the day before she testified.

When asked about her relationship with Sowers and what Sowers was in jail for Mother responded: "Some stuff that he got in trouble with, and I'm not gonna disclose that to you guys." Mother agreed that it was not a good idea to get involved with someone who had a drug problem while dealing with KVC, but she testified Sowers was out of drug treatment. She then said she did not understand why she could not be in a relationship with someone on probation. When asked if her relationship with Sowers was over Mother stated, "Yes and no. . . . Well, I don't know . . . if he's gonna get out of jail, or if he's gonna go straight to prison after his charges are done." When asked for clarification, Mother stated: "If he goes to prison I am not going to be in a relationship

15

with him." But when asked if that meant she would stay with him if he did not go to prison, Mother said she would not stay with him and that they were just friends.

Mother testified that she did not think KVC did enough to help her. She believed KVC should have helped her get a divorce rather than refer her to Kansas Legal Aid, which would have cost $800. Mother also stated that if KVC had found her a therapist right after her PMTO ended the children would have been returned to her. But Mother could not explain what therapy she needed or how it would have helped. Mother looked into individual therapy at KU, as recommended, but determined she could not afford it because it would cost $48 per week. Mother could not explain why she chose to put money toward Father's commissary and phone accounts rather than put it toward individual therapy. Mother later went to therapy at the Sexual Trauma and Abuse Care Center, which she said she completed since she finished the book they were using.

Mother stated that Je.W. and Ja.W.'s relationship was merely an older sister/younger brother type of relationship and Je.W. was not Ja.W.'s caregiver. Mother stated that A.W. needed therapy because she was separated from her family. Mother also does not believe that Ja.W. has any special needs.

Mother testified that if the children were reintegrated with her, she would plan on getting her own place. Mother looked at an apartment in January 2018, but it would take her a month or two to save up enough money to move. When asked how she would deal with the children's medical and therapy appointments while working the second shift, Mother stated she would "set 'em up during the school hours, or just pull them out of school. Or just take them before [she] go[es] to work."

Mother also called Jennifer Greever, her therapist at the Sexual Trauma and Abuse Care Center from June 2018 to November 2018. Greever testified that Mother completed online training on the prevention of childhood sexual abuse. Mother also worked through

a book called the Courage to Heal, which Mother reported she had completed. Mother told Greever that if the children told her they were sexually abused she would contact the police, which was an appropriate response. Mother ended therapy because she was no longer able to meet when Greever was available for appointments.

On May 23, 2019, the district court terminated Father's parental rights. On June 13, 2019, the district court terminated Mother's parental rights. The district court found that (1) Mother's emotional illness, mental illness, and mental deficiency were of such duration or nature as to render her unable to care for the needs of the children; (2) the reasonable efforts of DCF, KVC, and other agencies failed to rehabilitate the family; (3) Mother showed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children; (4) the conduct was unlikely to change in the foreseeable future; and (5) termination was in the children's best interests. Mother timely appeals, and this court consolidated the three appellate cases.

### DID THE DISTRICT COURT ERR IN FINDING MOTHER UNFIT AND TERMINATING HER PARENTAL RIGHTS?

A parent has a fundamental liberty interest in the right to make decisions regarding the care, custody, and control of the parent's child. But a parent's constitutional rights are not without limits. See *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019). The Revised Kansas Code for Care of Children (Revised Code), K.S.A. 2018 Supp. 38-2201 et seq., governs the termination of parental rights.

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a).

17

To determine whether a parent is unfit, the district court "shall consider, but is not limited to," statutory factors set forth in K.S.A. 2018 Supp. 38-2269(b) and (c).

> "'When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]'" *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

In doing so, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 56 Kan. App. 2d at 445.

Mother argues that the district court erred in finding that she was unfit and would remain unfit in the foreseeable future. Mother argues there was not clear and convincing evidence that she was unfit because she substantially complied with all the case plan tasks. Mother cites *In re A.M.*, No. 116,391, 2017 WL 2022704 (Kan. App. 2017) (unpublished opinion), for the proposition that because she substantially complied with the case plan, she should not be considered chronically unfit. Mother then spends the remainder of her brief on this issue arguing how the facts show she substantially complied with each of the case plan's recommendations. Mother does not address the three statutory factors of unfitness cited by the district court.

The State argues the record supports the three factors relied on by the district court. The State argues that at best Mother partially complied with the recommendations and, regardless of her compliance, Mother was still unable to retain the skills from parenting training.

We first note that *In re A.M.* does not hold that substantially complying with a case plan means a parent cannot be found unfit. Although the panel did mention the parent's compliance with the reintegration plan when reversing a district court's finding

18

that the parent was unfit, the panel reversed the district court's finding that the parent was unfit because the three statutory factors of unfitness it relied on were unsupported by the evidence. 2017 WL 2022704, at *4-6. Thus, the panel concluded that the evidence did not show the parent was unfit under the Revised Code, not that substantial compliance with the case plan negates a finding of unfitness. See 2017 WL 2022704, at *6.

Second, even if it were undisputed that Mother substantially complied with the case plan, her argument is essentially asking this court to find that her substantial compliance with the case plan outweighs the evidence showing she was statutorily unfit under the three factors cited by the district court. This court does not reweigh evidence on appeal. *In re K.L.B.*, 56 Kan. App. 2d at 445. Instead, this court reviews the evidence in the light most favorable to the State to determine if clear and convincing evidence exists to support the finding that Mother's rights should be terminated.

*The record reflects by clear and convincing evidence that Mother was unfit.*

The district court found three statutory factors that established Mother was unfit: (1) Mother's emotional illness, mental illness, mental deficiency, or physical disability was of such duration or nature as to render Mother unable to care for the ongoing physical, mental, and emotional needs of the children; (2) failure of reasonable efforts made by KVC, DCF, and other agencies to rehabilitate the family; and (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children. See K.S.A. 2018 Supp. 38-2269(b)(1), (7), and (8). When this court reviews a finding of parental unfitness for which the district court relied on multiple statutory factors, consideration of all the factors is unnecessary if clear and convincing evidence supports a finding of unfitness based on one of the factors. See *In re G.A.-S.*, No. 118,579, 2018 WL 2170077, at *3 (Kan. App. 2018) (unpublished opinion). In any event, there is clear and convincing evidence to support the district court's findings that Mother was unfit on each of the factors.

19

*1) Mother's mental deficiency or physical disability is of such duration or nature as to render her unable to care for the ongoing physical, mental, and emotional needs of the children.*

The evidence showed that Mother has an intellectual disability, originating from childhood, that gives her an overall mental age of only eight years and three months and renders her unable to recognize and care for the needs of the children. Because of her disability, Mother does not remember what people tell her and she is unable to increase her own knowledge; thus, Mother would not retain the information taught to her in parenting class. Dirks testified that attendance alone at parenting training is not enough for Mother to prove she can properly care for the children. Instead, Mother would need to show she processed the information and was able to implement it. The remainder of the record showed that Mother could not implement the skills learned in parenting training.

Couey testified that Mother "very rarely" implemented the strategies taught to her in parenting training. Chilton saw no change in Mother's implementation of skills when comparing visits from early 2018 to a visit shortly before the April 2019 termination hearing. Multiple KVC caseworkers testified that Mother could not properly supervise and interact with all three children and could not successfully implement boundaries at the visits, two of the topics Mother covered in PMTO. Berry also witnessed instances, after Mother's training ended, where she failed to implement skills she was taught.

Mother's cognitive delay causes her to have deficiencies in daily living skills and social judgment that hinders her ability to care for the children. Mother was also unable to feed the children or pay for individual therapy, but she consistently put $30 to $40 a week on Father's phone account. When asked why she chose to put the money toward Father's account instead of individual therapy, Mother could not explain her actions. Mother also admitted to being in a relationship with Sowers even though she knew Sowers was on probation and had a drug problem when she met him. Another example of poor social judgment is Mother's views on A.W.'s relationship. She told A.W., who was

20

and did not see her boyfriend, that she could not break up with him because he gave her a promise ring and she could not switch boyfriends after a year and a half.

The district court also determined that Mother lacks the mental capacity to understand the trauma the children may have suffered. Mother did not believe that A.W. rubbing lotion on Father and giving him massages was inappropriate because she believed it was equivalent to A.W. helping Mother apply lotion. Mother believed there was no chance Father sexually abused A.W. and Je.W. "because some of the time, or most of the time [she] was around 'em. Besides being at work. And he would never hurt his own kids." Mother also believed she would have known if sexual abuse occurred in her home at night because she would have been woken up by the noise. Mother also believes A.W. and Ja.W. only need therapy because of being separated from her.

Finally, as Dirks stated, Mother's "cognitive limitations make it hard for her to understand [the children's] needs, or how to supervise and care for them." Mother accepted her new job knowing she would have to work the second shift and, when asked how she would manage the children's appointments, she stated she would just pull the children from school. With her new job, Mother was not eligible to get insurance for six months and, when asked about insurance for the children, she stated she just assumed the children would stay on the State's insurance plan. In sum, viewing the evidence in the light most favorable to the State, there is clear and convincing evidence that Mother's intellectual disability renders her unable to recognize and meet the needs of the children.

*2) Reasonable efforts made by DCF, KVC, and other community agencies to rehabilitate the family have failed.*

DCF did not offer the family any services. But the record reflects that KVC made reasonable efforts to rehabilitate the family. KVC helped the children get started in therapy once they were placed in State custody in April 2017. KVC provided Mother

21

with financial help by giving her $30 gas cards monthly and by paying her utility bills twice. Ireland-Fish drove Mother home from visits a few times when Mother had car trouble. KVC also tried to help Mother fix her car, but Mother did not follow up with their request. KVC provided Mother with parenting training and worked with her on implementing the skills during family therapy. KVC supervised weekly visits from April 2017 through the termination hearing in April 2019, and they provided food at the visits.

Although KVC provided these services to Mother, she was unable or unwilling to make changes that would allow the visits to progress past supervised visits. Mother testified that she believed KVC could have done more. But when asked for specifics, Mother stated they should have gotten her into individual therapy sooner and should have helped her file for divorce. Mother's issues with KVC seem to be related to her own trouble with money. Dirks recommended Mother get individual therapy early in the case after she finished PMTO in January 2018, but Mother did not go because she could not afford the $48 per session, even though she was putting $30 to $40 per week on Father's phone account. As for the divorce, KVC referred Mother to Kansas Legal Aid, but she did not seek their help because she could not pay for their services. Thus, viewing the evidence in the light most favorable to the State, there is clear and convincing evidence that KVC made reasonable efforts to rehabilitate the family, but those efforts failed.

> *3) Mother displayed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children.*

The record shows by clear and convincing evidence that Mother displayed a lack of effort to adjust her circumstances and conduct to the needs of the children throughout the two years the children were out of her care. Mother admitted to repeatedly violating multiple court orders throughout the case. Mother knew she was not to have unsupervised contact with the children but did so anyway by contacting A.W. on Facebook at least once or twice a week. Mother even talked with A.W. the day before she testified at the

22

termination hearing. Mother also had contact with the children on their friends' phones and the bus driver's phone. Mother admitted that she violated the court's order that the children not have contact with Father by letting them talk to him on the phone. Mother also admitted to talking to the girls about Father's case and showing the girls the victims and calling them "bitch[es]" and "liar[s]." Mother blamed the children by admitting she violated the orders but also stating "so did [the girls]."

Throughout the case, Mother continued to choose Father at the expense of the children. Mother stated she believed Father committed the crimes after she read the police report in March 2018. But Mother continued to contact Father until November 2018, well after March 2018 and months after the motion for termination of parental rights was filed. Mother could not afford to feed the children one meal per week and could not afford individual therapy as recommended, but she repeatedly put $30 to $40 per week on Father's phone account and gave him $200 or $300 for the commissary. Mother stopped talking to Father in November 2018 because he was arguing and fighting with her and accusing her of dating other people. Mother only ended her relationship with him because of trouble in the relationship, not because of the needs of the children.

Finally, as discussed above, Mother failed to implement the parenting skills she learned in training and failed to supervise the children at visits. For instance, Mother let Je.W. care for Ja.W. Mother also would ask Ja.W. to clean up at the end of a visit, but when he failed to do so, rather than implement one of the PMTO strategies, Mother just cleaned up for him.

In sum, viewing the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Mother was unfit by reason of conduct or condition which rendered her unable to care for the children because of (1) her intellectual disability being of such duration or nature as to render her unable to care for the children's ongoing physical, mental, and emotional needs; (2) the reasonable efforts

made by KVC to rehabilitate the family have failed; and (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the children's needs.

*There is clear and convincing evidence that Mother would remain unfit for the foreseeable future.*

Clear and convincing evidence must also support the district court's finding that the conduct or condition rendering Mother unfit is unlikely to change in the foreseeable future. K.S.A. 2018 Supp. 38-2269(a). While Mother includes the foreseeable future language in her issue statement and her conclusion, she only refers to the language in passing in one sentence of her brief: Mother states she could procure adequate housing in one or two months "which is within the foreseeable future." Mother does not argue that there was no evidence to support the district court's conclusion that her conduct or condition was unlikely to change in the foreseeable future. "'A point raised incidentally in a brief and not argued there is deemed abandoned.' [Citation omitted.]" *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018).

In any case, there is clear and convincing evidence to support the district court's conclusion. The foreseeable future is examined from the perspective of a child. *In re K.L.B.*, 56 Kan. App. 2d at 446-47. A district court can look to the parent's past conduct as an indicator of the parent's future behavior. 56 Kan. App. 2d at 447. At the time of the termination hearing, the case had been pending for two years. In those two years, Mother could not progress past supervised visits because she is unable to implement parenting skills, unable to supervise and care for the children, and she still refuses to believe that Father could have harmed the children. Based on Mother's past conduct, she is either unwilling or unable, because of her intellectual disability, to change her conduct so that she could care for the children in the foreseeable future.

24

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN FINDING IT WAS IN THE CHILDREN'S BEST INTERESTS TO TERMINATE MOTHER'S PARENTAL RIGHTS?

Once the district court finds that a parent is unfit, it must determine whether termination of parental rights is in the best interests of the child. K.S.A. 2018 Supp. 38-2269(g)(1). "In making the determination, the court shall give primary consideration to the physical, mental or emotional health of the child. If the physical, mental or emotional needs of the child would be best served by termination of parental rights, the court shall so order." K.S.A. 2018 Supp. 38-2269(g)(1).

The parties agree that this court reviews a district court's determination of the best interests of a child for an abuse of discretion. An abuse of discretion occurs if (1) no reasonable person would take the view adopted by the district court; (2) the decision is based on an error of law; or (3) the decision is based on an error of fact. *In re P.J.*, 56 Kan. App. 2d 461, 465, 430 P.3d 988 (2018).

Mother argues that the district court erred in finding that it was in the children's best interests to terminate Mother's parental rights because there is no risk of sexual abuse between the children and Father since Father is in prison and because the children are bonded to Mother. The State argues that the record established that Mother had made little improvement and could not keep the children safe. The State also points to Mother's low functioning and inability to appreciate the children's needs as supporting the decision that termination was in the children's best interests.

Mother does not argue that the district court made an error of law or fact. Thus, Mother's argument seems to be that no reasonable person would take the view adopted by the district court because Father is in prison and Mother and the children are bonded. There is no dispute that Mother loves the children. But simply because Mother loves the children does not mean that termination of parental rights is not in their best interests.

25

The district court considered the physical, mental, and emotional health of the children and "consider[ed] the nature and strength of the parent/child relationship and the possible trauma termination of parental rights might cause to the children against the delay in permanency for each child and finds that it is in each child's best interest[s] to terminate the rights of [Mother]." Thus, the district court did consider Mother's bond with the children, but the district court reasonably found that any detriment because of the severance of such a bond was outweighed by the other evidence presented at the termination hearing.

The children all have significant physical or mental health needs that will require additional and consistent treatment. A.W. has minor developmental delays, PTSD, a major depressive disorder, trust issues, an extreme fear of failure, and shows signs of parentification. Je.W. has medical needs and significant mental health needs, so much so that she was placed in a treatment facility in December 2018 and remained there through the termination hearing. In addition, Je.W. is parentified and feels the need to be a caregiver. Ja.W. has been diagnosed with an adjustment disorder and attends therapy weekly.

Because of these needs, A.W. needs a caregiver who is patient and will praise her efforts as well as be consistent and set clear boundaries. Je.W. needs a caregiver who can create a structured environment and allow her to be a child. Ja.W. needs a caregiver who will support his mental health and someone he can trust to keep him safe. The children were not receiving this type of environment from Mother.

In the two years that this case was pending, Mother was unable, because of her intellectual disability, or unwilling to recognize and meet the needs of the children. At the time of the termination hearing, she had made little progress in implementing even basic parenting skills such as supervision and limit setting. Many of the State's witnesses and Mother—by requesting in her brief that she have a chance to progress in visits and then

26

ultimately have the children returned—recognize that even if her rights were not terminated, Mother was still not ready to have the children returned and supervised visits would have to continue for an indeterminate time. Thus, a reasonable person could agree that the detriment of severing the children's relationship with Mother is outweighed by the children's need for permanency and the harm caused by further delay. Thus, the district court did not abuse its discretion in finding that the termination of Mother's parental rights was in the children's best interests.

WAS THE DISTRICT COURT'S FINDING IN PARAGRAPH 32 OF THE JOURNAL ENTRY DISCUSSING ALLEGED ABUSE BY FATHER SUPPORTED BY THE RECORD?

Mother argues that the factual finding in paragraph 32 of the district court's order is meritless. This paragraph states:

"32. There have been allegations that [Father] abused his children and [Je.W. and Ja.W.] have begun exhibiting sexualized behaviors. [Mother's] continued denial has created an environment where the children cannot safely discuss any trauma that they may have experienced at the hands of [Father] or the trauma of that happening to their friends."

Mother argues there was no "physical evidence" or "direct testimony" that the children were sexually abused by Father or that Mother did or should have known that abuse may have occurred. Mother argues that because this finding was "without merit," the district court used insufficient evidence to support the decision to terminate her parental rights and the termination must be reversed.

Mother's argument on this issue fails for three reasons. First, Mother cites no authority for her conclusion that if one factual finding of the district court lacks merit, the termination of her rights must be reversed. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is like failing to

27

brief the issue. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019). Second, even without the finding in paragraph 32, as discussed above, there is clear and convincing evidence to support the termination of Mother's parental rights. Third, the finding is supported by the record.

While there was no physical evidence of abuse, there was plenty of testimony that Father did or could have abused the children. Fulton-Mays testified that the child victims in Father's criminal case alleged that Father also sexually abused A.W. and Je.W. Chilton testified that Ja.W. reported to his foster parents that Father "used to push him down and do things that would hurt his bottom and his penis." Berry stated that Ja.W. told foster parents that his bottom may have been red because "my dad struck [*sic*] a great big police gun inside my bottom and shot me . . . . It's okay, he can't hurt me now, because I'm at your house." Ja.W. made statements about father hurting him, his sisters, and Mother, and Ja.W. was referred to therapy because he was acting out sexually. Thus, the record reflects that there were allegations that Father abused the children and that the children exhibited sexualized behavior.

There is also evidence to support the reasonable inference that the children may not feel safe discussing any potential abuse with Mother. Mother continually denied that Father committed his crimes, and she continued her relationship with him even after the motion for termination of parental rights was filed. Even at the termination hearing, Mother refused to recognize that it could be possible that Father abused the children. Mother also admitted that she called the criminal victims a bitch and a liar in front of her girls "a few times." Thus, the district court's finding in paragraph 32 is supported by the record. But even without the finding in paragraph 32, there is clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.